**Reversed and Remanded and Opinion filed August 27, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-15-00101-CV

## RICARDO G. CEDILLO, JASON C. ZEHNER, J. RUSSELL DAVIS AND DAVIS, CEDILLO & MENDOZA, INC., Appellants

### V.

## IMMOBILIERE JEUNESS ESTABLISSEMENT, Appellee

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-45412**

## O P I N I O N

In this legal malpractice case, a company asserts claims derivatively against the lawyers and law firm that represented two partnerships in which the company was a partner. The lawyers and law firm represented the partnerships pursuant to a written representation agreement, which contained a broad arbitration clause. After the company filed suit, the lawyers and law firm sought to compel arbitration under the arbitration clause. The trial court denied the motion to compel

arbitration. In this interlocutory appeal, the lawyers and law firm assert in a single issue that the trial court erred in denying their motion to compel. We reverse and remand.

## I. BACKGROUND

Appellants J. Russell Davis, Ricardo G. Cedillo, Jason C. Zehner,[1] and Davis, Cedillo & Mendoza, Inc. (collectively, DCM) are attorneys and a San Antonio-based law firm. Appellee Immobiliere Jeuness Establissement (IJE) is a Lichtenstein entity and a limited partner of 29 Kuykendahl Road, Ltd. (29 Kuykendahl), which in turn is a limited partner of 9.2 Louetta Road, Ltd. (9.2 Louetta). 29 Kuykendahl and 9.2 Louetta (collectively, the Original Partnerships) are Texas limited partnerships. From March 24, 2009 to June 6, 2011, DCM represented the Original Partnerships in litigation initiated by IJE in a Harris County district court involving a series of transactions relating to the development of an affordable housing complex called "Villages at Louetta," constructed on land previously owned by the Original Partnerships (the Louetta litigation). DCM represented the Original Partnerships in the Louetta litigation under a Legal Representation Agreement (the representation agreement) dated March 24, 2009. The representation agreement contains the following arbitration clause:

> **Arbitration**: Any disputes arising out of the relationship between Firm [DCM] and Client [the Original Partnerships] shall be submitted to binding arbitration, and both Firm and Client agree to be bound by the results of arbitration. The arbitration shall be governed by the Commercial Arbitration Rules of the American Arbitration Association. San Antonio, Bexar County, Texas shall be the exclusive venue, and any disputes submitted to arbitration shall be governed by the laws of the State of Texas.

---

[1] Zehner is a former associate and shareholder of the firm.

Pursuant to the representation agreement, DCM also represented several other defendants in the Louetta litigation: Radnor Joint Venture, Inc. (Radnor), the general partner of the Original Partnerships; Villages at Louetta Apartments, Ltd. (VLA), the partnership to which the Original Partnerships transferred the land for the Villages at Louetta development; Louetta Villages, LLC (LV LLC), the general partner of VLA; and Michael Beucler. Beucler is the president of Radnor.

IJE initially sought an order compelling the Original Partnerships to produce records concerning the Villages at Louetta transation in the Louetta litigation. But it amended its petition to assert claims for breach of contract and breach of fiduciary duty against Radnor and Michael Beucler regarding loan transactions totaling $1.4 million that allegedly benefited Beucler to the detriment of the Original Partnerships. In its third amended petition, IJE alleged additional facts and asserted derivative claims on behalf of the Original Partnerships against Radnor and Beucler, creating a potential conflict of interest between DCM's clients. On June 6, 2011, the trial court in the Louetta litigation granted DCM's motion to withdraw based on non-payment of fees and the potential conflict of interest arising out of IJE's assertion of derivative claims on behalf of the Original Partnerships.

After DCM withdrew, on May 30, 2013, the trial court in the Louetta litigation entered an order requested by IJE, granting IJE the right to wind-up the affairs of the Original Partnerships and authorizing it to maintain derivative actions on their behalf for "any existing claims the Partnerships may have against third parties." IJE and the Original Partnerships then entered into an agreed judgment with Beucler and Radnor in the Louetta litigation in which there was no finding that Beucler or Radnor committed fraud.

Meanwhile, IJE filed this legal malpractice suit on August 8, 2012, against DCM on behalf of the Original Partnerships. In IJE's live pleading, IJE alleges that DCM, through its legal work on the Villages at Louetta transaction and representation of the Original Partnerships in the Louetta litigation, assisted Beucler in concealing Radnor's improper use of loan proceeds. Specifically, IJE alleges that DCM represented Beucler and the Original Partnerships through June 6, 2011 (the date DCM's motion to withdraw from the Louetta litigation was granted). IJE further claims that, during this time, DCM was simultaneously representing the interests of the Original Partnerships, Beucler, and other entities involved in the Louetta Village transaction. According to IJE's pleading, Beucler and DCM placed their interests above those of the Original Partnerships, which adversely affected the partnerships.

Following the lifting of a seventeen-month abatement on August 15, 2014, DCM began producing documents in response to IJE's discovery requests. DCM provided the representation agreement containing the arbitration clause to its attorneys on October 1; DCM's attorneys reviewed the document for production to IJE and discovered the arbitration clause. On December 5, 2014, DCM filed a motion to compel arbitration and stay litigation pursuant to the Federal Arbitration Act (FAA) or, alternatively, under the Texas General Arbitration Act (TGAA). Shortly before the hearing on the motion to compel, IJE filed an opposition brief asserting numerous grounds for denying the motion: (1) there was insufficient evidence that the Original Partnerships agreed to the representation agreement; (2) IJE's claims fall outside the scope of the agreement; (3) even if the Original Partnerships would have been required to arbitrate their claims against DCM, IJE could not be compelled to arbitrate derivative claims on the Original Partnerships' behalf because IJE was not a party to the representation agreement; (4) the

4

arbitration provision in the representation agreement is unconscionable; and (5) DCM waived its right to arbitration.

The trial court denied DCM's motion to compel arbitration on January 15, 2015. In early February, the court issued an amended order clarifying that it was denying the motion on the ground that "IJE was not a party to the Representation Agreement and therefore cannot be compelled to arbitrate the derivative claims asserted on behalf of 29 Kuykendahl Road, Ltd. and 9.2 Louetta Road, Ltd." DCM timely noticed its appeal of the order and amended order denying its motion to compel arbitration. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.016 (authorizing interlocutory appeal of denial of motion to compel arbitration under the FAA); *id.* § 171.098(a)(1) (permitting interlocutory appeal of denial of motion to compel arbitration under the TGAA).

## II. ANALYSIS

In a single issue, DCM asserts that the trial court erred in denying its motion to compel arbitration.[2] First, we evaluate the validity of the arbitration agreement. Once we determine that DCM established that a valid arbitration agreement exists, we ascertain whether IJE is bound to that arbitration agreement and whether IJE's claims fall within the scope of the arbitration agreement. After examining IJE's factual allegations in its petition, we determine that IJE is bound to the arbitration agreement and further determine that we cannot say with positive assurance that the arbitration clause is not susceptible to an interpretation which would cover this dispute. Finally, we turn to the remaining arguments presented by IJE in its

---

[2] The parties agree that, although the trial court clarified that the basis for its denial of the motion to compel arbitration was that IJE was not a signatory to the agreement, we should consider the alternate grounds raised by IJE in resisting the motion to compel. As a matter of judicial economy, we have done so in this opinion.

5

response to the motion to compel arbitration and conclude that none of them provide a legal basis for the trial court's denial of DCM's motion.

## A. Standard of Review[3]

We review de novo whether an arbitration agreement is enforceable. *Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013) (citing *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding)). When reviewing the denial of a motion to compel arbitration, we defer to the trial court's factual determinations that are supported by evidence but review the trial court's legal determinations de novo. *Id.* The issues raised in this appeal all involve the enforceability of the arbitration agreement; thus we review them de novo.

## B. Validity of Arbitration Agreement

A party seeking to compel arbitration must first establish that a valid arbitration agreement exists. *In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011) (orig. proceeding). If the relevant parties did not sign the contract in which the arbitration agreement is found, addressing the first prong includes analysis of whether a non-signatory is bound by or can enforce the arbitration agreement. *See id.* at 223–24; *see also PAK Foods Houston, LLC v. Garcia*, 433 S.W.3d 171, 178 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd) (holding that even if claims

---

[3] When an arbitration agreement is silent about whether the FAA or the TGAA applies and neither party asserts the FAA applies or preempts the TGAA, we need not address whether the FAA applies. *See Branch Law Firm, L.L .P. v. Osborn*, 447 S.W.3d 390, 394 n.10 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 711 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The FAA and TGAA address the same underlying substantive principles. *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 n.10 (Tex. 2008) (noting the similarities of the acts and relying interchangeably on cases discussing the FAA and TGAA). Because the substantive principles applicable to our analysis are the same under either act, we cite cases decided under the FAA and TGAA interchangeably. *See id.*; *Branch Law Firm, L.L.P.*, 447 S.W.3d at 394 n.10.

6

were derivative, because there is no valid agreement to arbitrate, *Labatt* is inapplicable).

Arbitration cannot be ordered in the absence of an agreement to arbitrate. *Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994). Arbitration is favored under public policy, but it also is a creature of contract. *In re Poly–Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008) (orig. proceeding). We do not resolve doubts or indulge a presumption in favor of arbitration in deciding whether the parties have agreed to arbitrate. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding). Instead, through the neutral application of state contract law, we decide whether an enforceable agreement exists in the first instance and whether generally applicable contract defenses may be applied to invalidate the arbitration agreement. *See In re Poly–Am., L.P.*, 262 S.W.3d at 348.

Under Texas law, the trial court conducts a summary proceeding to determine the applicability of an arbitration clause. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (orig. proceeding). A motion to compel arbitration is similar to a motion for partial summary judgment and is subject to the same evidentiary standards. *In re Jebbia*, 26 S.W.3d 753, 756–57 (Tex. App.— Houston [14th Dist.] 2000, orig. proceeding). The party alleging an arbitration agreement must present summary proof that an agreement to arbitrate requires arbitration of the dispute. *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) (orig. proceeding); *Jebbia*, 26 S.W.3d at 757.

Here, the arbitration clause relied on by DCM is contained in the representation agreement between DCM and the Original Partnerships. Although DCM signed the representation agreement, the representative of the Original

Partnerships, David Beucler, did not sign the agreement.[4] "But neither the FAA nor Texas law requires that arbitration clauses be signed, so long as they are written and agreed to by the parties." *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005) (orig. proceeding) (per curiam). Further, if one party signs a contract, the other party's acceptance may be demonstrated by its conduct. *Smart Call, LLC v. Genio Mobile, Inc.*, 14-13-00223-CV, 2014 WL 3955083, at \*5 (Tex. App.—Houston [14th Dist.] Aug. 14, 2014, pet. denied) (citing *Hearthshire Braeswood Plaza Ltd. P'ship v. Bill Kelly Co.*, 849 S.W.2d 380, 392 (Tex. App.— Houston [14th Dist.] 1993, writ denied)).

DCM alleged in its motion to compel arbitration that (1) it had executed and performed under the representation agreement in reliance on its terms and (2) an email from Beucler's son, Reid Beucler, established the Original Partnership's agreement to the arbitration clause contained in the representation agreement. DCM attached a declaration from J. Russell Davis,[5] which incorporated numerous attachments and supported the motion. The email from Reid Beucler was attached to Davis's declaration. IJE objected to this email as hearsay and additionally made numerous hearsay objections to Davis's declaration, as well as objections to specific statements that it asserted were conclusory or lacked foundation. However, IJE failed to obtain a ruling on any of its objections. Thus, IJE's hearsay objections were not preserved. *See* Tex. R. App. P. 33.1(a); *cf. Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 112 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

---

[4] IJE attached numerous engagement letters between various entities represented by Beucler and DCM to its response. These letters range in date from January 21, 1997 to March 25, 2009. Many of these engagement letters are not signed by Beucler. And **none** of these letters reference the Original Partnerships.

[5] *See* Tex. Civ. Prac. & Rem. Code Ann. § 132.001(a), (c).

In his declaration, Davis stated:

> In my dealings with Michael Beucler, Reid Beucler often acted as a representative for Michael and his affiliate companies. <u>Based on prior experience, I expected that Reid Beucler was authorized to act as Michael Beucler and his companies' representative with respect to DCM's representation of the Defendants in the Original Dispute.</u> On or about March 24, 2009, I gave Michael and Reid Beucler a copy of the Representation Agreement signed on behalf of DCM by Mr. Cedillo. I later received an email from Reid Beucler agreeing to the Representation Agreement.

Even if we disregard the portion of this excerpt, underlined above, that IJE asserted was conclusory, Davis's declaration supports DCM's contention that the Original Partnerships agreed to the representation agreement. Specifically, Davis stated that Reid Buecler acted as a representative for Michael Buecler's companies and that he received an email from Reid agreeing to the representation agreement. In an email from Reid also attached to the motion, Reid stated that "the engagement and memo look fine." He requested that DCM provide these documents electronically so that he could forward them to the Louetta entities' representative, John White, "for signature and review." The representation agreement contained in our record is signed by John White.

Moreover, it is undisputed that the Original Partnerships were represented by DCM during the Louetta litigation until the date that DCM withdrew. An unobjected-to copy of the letter from DCM notifying David Beucler of its withdrawal was attached to DCM's motion to compel. In this May 25, 2011 letter, DCM reminded Beucler that it represented Beucler, 9.2 Louetta, 29 Kuykendahl, Radnor, VLA, Louetta Villages, and Beucler in the Louetta litigation. DCM explained:

> From the outset, we advised the Clients that our representation is contingent on our ability to exercise independent professional

9

judgment on behalf of each client. If we find there are conflicting interests between any of the Clients, such that we cannot impartially represent each client, then it is our duty to withdraw from representing all of the Clients.

The allegations plead in this litigation, if proved, create a conflict of interest between certain Clients and/or the various Principals. As a result this firm is compelled to withdrawal [sic] as counsel of record to the Clients.

The letter provides that a motion to withdraw was being filed on the same date as the letter. And it is undisputed that DCM withdrew from representing the Original Partnerships in June 2011.

Under these circumstances, the fact that the representation agreement containing the arbitration provision is unsigned by the Original Partnerships does not indicate that the Original Partnerships did not intend to be bound by it. To the contrary, the uncontroverted evidence establishes that the partnerships did, in fact, accept the representation agreement by their conduct: they accepted DCM as their counsel in the Louetta litigation until DCM withdrew due, in part, to a potential conflict. *See Hearthshire Braeswood Plaza Ltd. P'ship*, 849 S.W.2d at 392. And by accepting the representation agreement, they also accepted the arbitration clause contained therein. *See Greenberg Traurig, LLP v. Nat'l Am. Ins. Co.*, 448 S.W.3d 115, 121–22 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We, therefore, conclude that a valid arbitration agreement exists between the Original Partnerships and DCM.

## C.    IJE is bound by the Arbitration Agreement

As discussed above, there is no dispute that IJE is suing derivatively on behalf of the Original Partnerships. Generally, a plaintiff bringing claims derivatively "steps into the shoes" of the party on behalf of whom the derivative plaintiff sues and is bound by any agreements to which that party has agreed. *See,*

10

*e.g.*, *In re Labatt Food Serv., L.P.*, 279 S.W.3d at 644–46 (determining that wrongful death beneficiaries are placed in the exact "legal shoes" as the decedent and thus are bound by any arbitration agreement entered into by the decedent); *Richardson v. Newman*, 439 S.W.3d 538, 542 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (explaining that shareholder who brings a derivative suit "steps into the shoes of the corporation and asserts the corporation's claims for damages against the directors"); *Ross v. Union Carbide Corp.*, 296 S.W.3d 206, 217 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ("Because of the derivative nature of their claims, wrongful-death beneficiaries are generally bound by the injured family member's contract releasing the alleged tortfeasor from liability.").

IJE urges that the mere fact that it is suing derivatively and "steps into the shoes" of the Original Partnerships, standing alone, is irrelevant. Instead, IJE urges that the only question presented is whether liability "arises from or relates to the contract containing the arbitration provision." We conclude that IJE is bound to the provision because (a) it is bringing derivative claims for the Original Partnerships and (b) we cannot say with "positive assurance" that those claims are beyond the scope of the arbitration clause.

### 1. IJE steps into the shoes of the Original Partnerships

First, we note that the general principle discussed in *In re Labatt Food Service*—derivative plaintiffs "step into the shoes" and are bound by contracts entered into by the party on whose behalf they are suing—is a principle that has been applied to arbitration agreements. Specifically, courts, including this court, have held that derivative plaintiffs are bound by the arbitration agreements entered into by the party for whom they are suing. *See, e.g.*, *In re Labatt Food Serv., L.P.*, 279 S.W.3d at 644–46 (wrongful death beneficiaries bound by arbitration agreement entered into by decedent); *Zaporozhets v. Ct. Appointed Receiver in*

11

*Cause No. 12-DCV-199496*, No. 14-14-00143-CV, 2014 WL 5148151, at *1, 9 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (receiver asserting claims derivatively on behalf of companies against companies' former accountant required to arbitrate those derivative claims falling within the scope of arbitration agreement between companies and accountant); *Stanford Dev. Corp. v. Stanford Condo. Owners Ass'n*, 285 S.W.3d 45, 49–50 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("[I]n this case, the individual owners bound themselves to arbitrate their claims with Stanford. Thus, the Association, when suing on the owners' behalf, is also bound to arbitrate. . . .").

We see no reason to depart from the well-established principle that a plaintiff suing derivatively on behalf of another party is bound to any relevant agreements to which that party agreed, including a valid arbitration agreement. Thus, to the extent the trial court denied the motion to compel arbitration solely because IJE was not a party to the arbitration agreement, the trial court erred.[6]

### 2. IJE's derivative claims fall within the scope of the arbitration provision

Once an arbitration agreement is found to exist, we resolve doubts regarding an agreement's scope in favor of arbitration because of the strong presumption favoring agreements to arbitrate. *In re Kellogg Brown & Root*, 166 S.W.3d at 737. This policy favoring arbitration is so compelling that a court should not deny arbitration "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Prudential Secs. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995) (orig. proceeding) (per curiam) (internal quotation marks and emphasis omitted). The

---

[6] In its brief, IJE appears to concede the trial court erred in denying the motion to compel arbitration solely on this basis: "To the extent the trial court denied arbitration based solely on the single ground that IJE was not a party to the Representation Agreement, doing so was error."

12

burden is on parties opposing arbitration to show their claims fall outside the scope of the arbitration agreement. *Id.* at 899–900; *see also Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 712 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (where an arbitration clause is broad, burden is on party opposing arbitration to show that its claims fall outside scope of clause). If the scope of an arbitration clause is fairly debatable or reasonably in doubt, it will be construed in favor of arbitration. *FD Frontier Drilling (Cyprus), Ltd. v. Didmon*, 438 SW.3d 688, 694 (Tex. App.—Houston 1st Dist.] 2014, pet. denied). In determining whether a claim falls within the scope of an arbitration agreement, we focus on the factual allegations of the complaint rather than the legal causes of action asserted. *See Prudential Secs. Inc.*, 909 S.W.2d at 900.

"The presumption of arbitrability is particularly applicable when the clause is broad; that is it provides for arbitration of 'any dispute arising between the parties,' or 'any controversy or claim arising out of or relating to the contract thereof,' or 'any controversy concerning the interpretation, performance, or application of the contract.'" *Baty v. Bowen, Miclette & Britt, Inc.*, 423 S.W.3d 427, 440 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Here, the arbitration agreement is broad in scope: it covers "any dispute arising out of the relationship" between DCM and, as is relevant here, the Original Partnerships. The term "relationship" is not defined by the representation agreement; however, the term "representation" is defined to include only the legal representation of the client's interests in the Louetta litigation. The parties used the broader term "relationship" in the arbitration provision, rather than the defined term "representation." Thus, the presumption of arbitrability is particularly applicable in this case. *See id.*

13

IJE asserts that because the underlying facts of this lawsuit all arose before the representation agreement was entered into by the Original Partnerships, the arbitration agreement does not apply to this litigation. But in its live pleading, IJE alleged the following facts:

- [S]ometime between December of 2001 and March 2002 Beucler closed on two separate loans respectively in the amount of a $1,000,000.00 and $400,000.00 (collectively the "$1.4 Million Loan). Both of these loans were personal to Beucler and the proceeds were all used for non-partnership purposes.

- Beucler, with the knowledge and assistance of his attorneys . . . helped collaborate [sic] a scheme whereby the Original Partnerships lost at least $1.4 Million in partnership assets. Specifically, Beucler with the help of his attorneys . . . collateralized partnership tracts of land that were at one time free and clear of any liens so that Beucler could be approved for the $1.4 Million Loan and/or the refinance of that loan. . . . The loan proceeds were then used for a non-partnership purpose: namely, to enhance the balance sheet of an unrelated company, FAS Construction Management Coimpany, Inc. ("FAS"), which was owned by Beucler. FAS was in the business of providing construction risk management for banks, developers, and contractors and was in dire financial straits and in need of a quick capital infusion. To accomplish this goal, Beucler . . . put up the Tracts of partnership land as collateral for the $1.4 Milllion Loan in partnership proceeds which in turn went directly . . . to FAS'[s] operating account. The loan was never taken out in the name of the Original Partnerships, the proceeds of the loan never went to any Partnership account nor served any partnership purpose. . . .

- When the maturity date on the [$1.4 Million Loan] was approaching, Beucler managed, with the assistance and guidance of his attorneys, to have the Loan refinanced. . . The aim of the [refinancing] was simply to bridge the payment of the loan to receiving project financing for the development of the Tracts into an Affordable-Housing/multi-family project known as Villages at Louetta Apartments (the "Project"). Before the maturity date of

14

the . . . loan, Beucler and his lawyers were able to secure Project financing . . . around February 13, 2004.

- Part of the proceeds from the Project financing . . . went to pay off the $1.4 Million Loan.  None of that money was repaid by . . . Beucler but came out of Partnership Funds. . . .  Beucler and his attorneys then used the elaborate refinancing scheme as a means of masking the real purpose on how the proceeds of the $1.4 Million Loan were actually used.  Instead of complying with their fiduciary duties, the lawyers helped Beucler hide the truth by concocting a partnership purpose for the use of the loan proceeds which they all knew to be untrue.

- Specifically, IJE was told by J. Russell Davis ("Davis") of [DCM] that the loan proceeds were used "***In order to fund [the] development process, of 29 Kuykendahl and 9.2 Louetta***" which money "***went to FAS to apply as development costs to develop a viable/finance-able model for Affordable Housing development***".  Further Davis went on to state that "***FAS did formulate such model which resulted in the development of the 12 Acre Tract and the 6.7 Acre properties for Affordable Housing***".  As result "***FAS received a fee for assistance in the development of the project, out of the construction financing of $1.4 Million, which was applied to fully extinguish the Loan***."

- The lawyers representing Beucler and the Original Partnerships in this transaction through June 6, 2011 were [attorneys at DCM]. During this time and on information and belief, the lawyers were simultaneously representing the interest of the Original Partnerships as well as Beucler and other entities involved on the [affordable housing] project.  In the transactions, the lawyers would review the partnership agreements and other transaction documents and advise Beucler individually and as GP to the Original Partnerships on numerous matters including whether or not he had authority to close the $1.4 million loan or go through with other various transactions related to the housing project and whether the interests of the Original Partnerships were protected.

(emphasis in original).

15

Focusing on these factual allegations and construing the arbitration agreement broadly, at least some portion of IJE's allegations fall within the scope of the arbitration clause. Indeed, many of these facts are not associated with any date at all, and IJE did not identify when the Louetta project was started or completed. Further, IJE acknowledges that DCM represented the Original Partnerships until June 6, 2011 and alleges that "during this time," DCM was simultaneously representing the interest of the Original Partnerships and other entities. At least some of this time was *after* the Original Partnerships entered into the representation agreement containing the arbitration provision. Further, there is no doubt that the claims made by IJE arise from the "relationship" between the Original Partnerships and DCM; as explained above, the arbitration provision at issue in this case focuses on the "relationship" between the parties rather than the "representation" of the Original Partnerships by DCM. In other words, it cannot be said with positive assurance that the arbitration clause here is not susceptible of an interpretation that would cover the dispute at issue. *Prudential Secs. Inc*, 909 S.W.2d at 899.

Nonetheless, IJE asserts that this issue has already been determined in its favor by our sister court in *Bristow v. Jameson*, No. 01-96-00113-CV, 1996 WL 277138, at *1 (Tex. App.—Houston [1st Dist.] May 22, 1996, no pet.) (not designated for publication). First, this opinion lacks precedential value because it was not designated for publication. *See* Tex. R. App. P. 47.7(b) ("Opinions and memorandum opinions designated "do not publish" under these rules by the courts of appeals prior to January 1, 2003 have no precedential value but may be cited with the notation, '(not designated for publication).'"). Moreover, this case is readily distinguishable from the present circumstances. In *Bristow*, the parties had a prior representation contract that did not contain an arbitration provision.

*Bristow*, 1996 WL 277138, at \*1. During the course of the suit in *Bristow*, the parties entered into a second representation contract, which did contain an arbitration provision. *Id.* at \*1–2. The arbitration provision in the second contract stated, "Any disputes relating to this Contract or arising in connection with Attorney's representation of Client will be subject to binding arbitration . . . ." *Id.* at \*5. The First Court of Appeals concluded that the trial court correctly determined that the arbitration provision in the second contract applied only to matters relating to that contract, not to matters relating to the first contract. *Id.* Here, as noted above, IJE provided no evidence that the Original Partnerships had any prior representation agreement with DCM.[7] Thus, the rationale in *Bristow* is inapplicable to this situation.

For the foregoing reasons, we conclude that IJE failed in its burden to establish, with positive assurance, that the arbitration provision here is not susceptible of an interpretation that would cover the claims at issue here. *See Prudential Secs. Inc*, 909 S.W.2d at 899. Thus, we conclude that the claims[8] brought by IJE on behalf of the Original Partnerships fall within the scope of the arbitration provision contained in the representation agreement.

In sum, we conclude that DCM established a valid arbitration agreement and the claims at issue fall within its scope. Thus, we turn to the other defenses to arbitration raised by IJE in its response to the motion to compel arbitration.

---

[7] None of the engagement letters provided by IJE were between DCM and the Original Partnerships. *See supra* note 4.

[8] IJE made no effort in the trial court or on appeal to establish that any of its individual claims against DCM fall outside the scope of the arbitration provision.

17

**D.  Unconscionability of Arbitration Agreement**

IJE further asserted that the arbitration provision is unconscionable. Unconscionable agreements, whether relating to arbitration or not, are unenforceable under Texas law. *In re Poly-Am., L.P.*, 262 S.W.3d at 348. "Because the law favors arbitration, the party opposing arbitration bears the burden to prove unconscionability." *TMI, Inc. v. Brooks*, 225 S.W.3d 783, 792 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Arbitration agreements are not per se unconscionable, including arbitration agreements between attorneys and clients. *See In re Pham*, 314 S.W.3d 520, 526 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding, pet. struck).

In its response to DCM's motion to compel arbitration, IJE sought to place the burden on DCM to prove that the arbitration agreement at issue here is not unconscionable. IJE presented no evidence in support of its unconscionability argument, aside from the existence of the agreement between a law firm and its clients. In short, IJE failed to meet its burden to prove the arbitration agreement here is unconscionable. *TMI, Inc.*, 225 S.W.3d at 792. Thus, IJE's unconscionability defense provides no basis for denying DCM's motion to compel arbitration.

**F.  Waiver of Arbitration**

IJE also urged that DCM waived its right to arbitration. A party waives a right to arbitration by substantially invoking the judicial process to the other party's detriment. *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 SW.3d 573, 574–75 (Tex. 2014) (per curiam); *Baty*, 423 S.W.3d at 433. Because of the strong presumption against waiver of arbitration, IJE has the difficult burden of proving that DCM waived its right to arbitrate. *See Baty*, 423 S.W.3d at 433. "Whether a party has substantially invoked the judicial process depends on the

18

totality of the circumstances; key factors include the reason for delay in moving to enforce arbitration, the amount of discovery conducted by the movant, and whether the movant sought disposition on the merits." *Richmont Holdings, Inc.*, 455 S.W.3d at 575. Any doubts regarding waiver are resolved in favor of arbitration. *See Baty*, 423 S.W.3d at 433–34.

Here, DCM and two other defendants filed a motion to transfer venue in September 2012. But filing a motion to transfer venue does not waive arbitration. *See Richmont Holdings, Inc.*, 455 S.W.3d at 576. Further, although twenty-eight months passed between the filing of this lawsuit and the motion to compel arbitration, the case was abated for over half that time.[9] DCM moved to compel arbitration on December 5, 2014, less than five months after the abatement was lifted on August 15, 2014. DCM claims that its attorneys discovered the existence of the arbitration clause covering this dispute only when it began producing documents in response to IJE's requests for production. Although this explanation may be implausible, "mere delay in moving to compel arbitration is not enough for waiver." *Id.* (citing *In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692, 694 (Tex. 2008) (orig. proceeding) (per curiam) (eight-month delay); *In re Vesta Ins.*

---

[9] On February 26, 2013, DCM moved to abate the case on the ground that IJE lacked capacity to maintain this suit because (1) the charters of the Original Partnerships had been forfeited for nonpayment of taxes, and (2) IJE was not registered to do business in Texas and therefore lacked capacity to assert derivative claims on behalf of the Original Partnerships. The trial court granted the motion to abate on March 8, 2013. IJE filed a motion for clarification and two motions for reconsideration of the abatement order before filing a petition for mandamus relief with this court. After hearing oral argument, we denied the petition with respect to the trial court's abatement due to IJE's failure to register to do business in Texas and granted the petition with respect to the lapsing of the Original Partnerships' charters. *In re Immobiliere Jeuness Establissement*, 422 S.W.3d 909, 918 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding).

Six months later, IJE moved to lift the abatement on the ground that it had registered to do business in Texas. The trial court lifted the abatement on August 15, 2014, issued a scheduling order on September 4, 2014, and granted the parties' joint motion for a protective order on October 21, 2014. In total, the case was abated for seventeen months.

*Group, Inc.*, 192 S.W.3d 759, 763 (Tex. 2006) (orig. proceeding) (per curiam) (two-year delay)).

Further, very little discovery has occurred in this case: no depositions have been formally noticed or taken; no third-party discovery has taken place; no motions to compel have been filed. DCM issued one set of requests for production to which IJE has not responded, and DCM issued one set of interrogatories to IJE to which IJE provided written responses. IJE issued one set of requests for production and one set of interrogatories to DCM. DCM provided written responses to the interrogatories and produced nearly 15,000 pages of documents in response to IJE's request for production. This level of discovery does not substantially invoke the judicial process. *See, e.g.*, *Baty*, 423 S.W.3d at 436 (holding that party did not substantially invoke the judicial process by serving four sets of requests for production, four sets of interrogatories, four subpoenas duces tecum, and taking seven depositions). Finally and importantly, DCM has not filed any motions seeking a ruling on the merits. *See Richmont Holdings, Inc.*, 455 S.W.3d at 575 (noting that whether movant sought disposition on merits is "key factor" in determining if party "substantially invoked" judicial process).

Under the circumstances presented here, considered as a whole, IJE has not established that DCM substantially invoked the judicial process *See, e.g.*, *id.* at 576; *Baty*, 423 S.W.3d at 436–38. Having reached this conclusion, we need not consider whether IJE was prejudiced by the delay. *See Richmont Holdings, Inc.*, 455 S.W.3d at 576 Thus, IJE's waiver arguments offer no support for the trial court's denial of the motion to compel arbitration.

### III. CONCLUSION

DCM established that (1) a valid arbitration agreement exists between DCM and the Original Partnerships, and (2) IJE is bound by that agreement because it is

suing derivatively and the claims at issue are within the scope of the agreement. IJE provided no valid basis for denying the motion to compel arbitration. For the reasons stated above, we reverse the trial court's denial of the motion to compel arbitration and remand for proceedings consistent with this opinion.


/s/     Sharon McCally
Justice


Panel consists of Justices Boyce, McCally, and Donovan.